All right, our next case this morning is number 19-13276 United States v. US Stem Cell Clinic, LLC. And we will begin with Ms. Chamberlain on behalf of the appellants. Thank you, your honor. May it please the court. Um, this case is about the words and meaning of an FDA regulation that the agency concedes in its briefs and on this appeal is unambiguous. A key part of that is the definition of the following words in that regulation, open quote, human cells, tissues or cellular and tissue based products, end quote. That is abbreviated throughout the regulation as HCTPs. In this case, it's undisputed that what was implanted and what was intended to be implanted in the SVP surgical procedure developed and utilized by the appellants was only the stem cells referred to as SVP, which is stromal vascular fraction cells. The adipose tissue, which is fat tissue from which those stem cells are derived was not intended for implantation and was not in fact implanted in a human recipient. There is no dispute about those facts about what was intended for implantation and what was actually implanted. Because by definition, an HCTP under section 21 CFR 1271.3 sub D is an HCTP that is, quote unquote, intended for implantation. The only cells that are HCTPs with reference to the SVP surgical procedure are the SVF stem cells themselves. Ms. Chamberlain, could I interrupt you for a moment because I'm trying to get my head around all of this statutory and regulatory language and how it all interlocks together. What about the issue concerning the processing of these samples for lack of a better, or tissue for lack of a better term? How, if at all, does that affect the result here? There are two different sections in this regulation that are the subject of lower court action and there are appeal. One is what's called the same surgical procedure exception, which is section 1271.15 sub B, which basically excludes from regulation by FDA by the remainder of that part certain surgical procedure, which is a surgical procedure in which an establishment removes HCTPs from an individual and implants such HCTPs into the same individual during the same surgical procedure. That's the SSP exception to part 1271. And in that exception, there's no reference to a modification or changes or cleansing or anything of the kind. What that becomes relevant to is a totally separate section of the regulation, and that is section 1271.10 sub A, in which it is stated that certain HCTPs will be regulated, but only under section 361 of the Public Health Service Act, so that there are two different situations. One is where you meet the criteria of the same surgical procedure, which is cells or tissue or whatever from the same individual implanted, removed and implanted back into the same individual in one surgical procedure. That's the key phrase behind the SSP exception abbreviation. That's one thing. You could have a situation where those requirements are not met in which the the HCTPs are removed and implanted in somebody else, or they're removed and implanted in a different procedure. In those cases, obviously, the SSP, the same surgical procedure exception would not apply. But under certain requirements, they could be subjects to only limited regulation under section 1271.10 A. In order to qualify for that limited regulation, then the issue of minimal manipulation comes into play. And as is shown by the history of the regulation, the reason for there being a distinction between the same surgical procedure exception, which does not have any limitation on more than minimal manipulation or, for that matter, on homologous use, which is another limitation under section 1271.1, the reason for those two distinctions was that the FDA, when this regulation was considered and eventually adopted back in 2001, a determination based on information that was gathered during the rulemaking procedure, public comment phase, etc., was that the risks involved in removing HCTPs, be it cells, tissues, or whatever, from an individual and putting them back into that same individual had less risk of infection or other problems that would be associated with, you know, implantation into another individual. And also because they were in the same surgical procedure, so that they didn't have any risk associated with storage, transportation, potential loss or mismarking or, you know, chain of custody issues. All of those issues were considered when the rule was adopted. The regulation was adopted back in 2001, and that is why FDA decided to have the same surgical procedure have, in effect, lesser restrictions with respect to not being more than minimally manipulated because it was a safer procedure. They deemed that the autologous, which means the same individuals have the cells or whatever removed and re-implanted, the autologous use and the same surgical procedure, that that was a less risky situation than could be envisioned with transplantation or whatever from one person to another and the possible storage for, you know, days, weeks, months, or the transportation over great distances that is envisioned in the 361 HCTPs issue, which is under 1271.10a. So, those are the justifications for there being two different kinds of treatment. And, in fact, nothing that the FDA has argued in the lower court on the appeal shows that those reasons for those distinctions have changed from 2001 to 2017 when FDA started taking a different position vis-a-vis its own regulation. And, in fact, although they say, they said below and they said in their briefs that there is danger associated with the SVF surgical procedure, the SVF surgical procedure falls, have we lost someone off the bench? Someone's video is off. Well, we'll check. Just, you can continue going now. Anthony, can you check on Judge Ginsburg, please? Yes. You can keep going, Ms. Chamberlain, because I think he can hear. We may have just lost the video. There we go. Thank you very much. There has been, there was no showing that the reasons why the same surgical procedure exception procedures were deemed safe in 2001 to why they're not safe now, even though the SVF surgical procedure was developed and implemented and used on thousands of patients that with no findings that those types of procedures were no longer safe because there was no rulemaking, no public comment, you know, proceedings that happened to show otherwise, that is one of their asserted, unproven, and widely contested justifications for saying that, well, after seven years, we now think that our same surgical procedure exception means something different than what it clearly says in the regulation. So, do you want to discuss for a moment your argument about not giving deference to the FDA's 2017 guidance document? Yes, Your Honor, I will do so. And we, I think that in a way that is a very interesting issue because Judge Ungaro in the lower court specifically based her holding, her ruling, on her determination that the regulation was ambiguous. And therefore, she had to bring in the 2017 guidance document. FDA on appeal has repeatedly stated that its regulation is unambiguous, yet it continues to rely on its guidance, which if Kaiser is to believe, be believed, and if the executive orders regarding the use of guidance documents is to be credited, we don't have to even get into the guidance documents. Because if we look at the clear language of the regulation itself. Two minutes, counsel. Two minutes, please. Thank you very much. You're welcome. These stem cells are clearly HCTPs. And in order to arrive at a outcome that's dictated by the guidance document, you have to change the definition of HCTPs. The, the fact is that the, sorry, nothing in 1271.3 says that an HCTP is something that cannot be isolated from a greater substance. The FDA does not dispute the fact that when it comes to stem cells, they always have to be And in fact, that is recognized in the definition of HCTPs itself. The HCTPs definition includes a non-exclusive list of examples, including stem cells, quote, unquote, derived from tissues and blood. And I, we can take the position that the words derived from indicates that the stem cells in this case, these SVP cells that are intended for implantation are are not the same as the tissue that they are derived from. If the FDA's position that the adipose tissue is the same as the SVF stem cells for purposes of the same surgical procedure exception, then the words cells derived from tissue in the definition of HCTP cannot be true because derived from under the FDA's argument on appeal would mean that it could not be an HCTP, as opposed to being by definition an HCTP, which is exactly what the words of FDA's unambiguous regulation provides. All right, Ms. Chamberlain, thank you very much. You've saved your time for rebuttal. Okay, we'll hear from Mr. Jed on behalf of the United States. Mr. Jed, whenever you're ready. I think you're muted. Apologies. Good morning, your honors. Adam Jed for the United States. Defendants cannot seriously dispute that their biological product, which is marketed for the treatment of things like Parkinson's disease and macular degeneration, is a drug under the FDCA and is adulterated and misbranded. Defendants instead contend that the statute cannot be enforced based on a narrow regulatory exception used for skin grafts and artery bypass and things like that, that is applicable if they remove an HCTP and then return that HCTP. And the district court correctly found otherwise for three reasons, the plain text of the regulation, the context, structure, history, and purpose of the regulation, and FDA's official considered and expert view. Now, I just want to begin with the plain text of the regulation, which makes clear that this narrow exception is applicable when you remove HCTPs and then implant such HCTPs. Now, just as a matter of common sense, anyone who observed the creation of the product at issue here would say that what was removed was adipose tissue, was fat. You would be standing there in an operating room watching fat be removed from somebody. And plaintiff, excuse me, defendant's position is essentially that once they have manufactured their final product, this stromal vascular fraction product, which by the way, contrary to what my friend was just saying, is not simply stem cells, it's an amalgamation of different kind of cells that exist in the fat tissue, that they can somehow step back in time and pick and choose whatever combination of cells ended up in the final product and say that that's the particular HCTP that's being referenced back to. And maybe if I could give your honors just a kind of concrete example, just to illustrate this point. In skin grafting, doctors remove skin, they may trim it a little bit, they may wash a little bit of blood off of it to make it easier to sew back on, but then they return skin. If instead doctors removed skin and dissolved it in a vat of acid, and then skimmed off some of that liquid, and then returned it, nobody would say that what they had returned was skin. And I think it would be particularly strange just as a textual matter to say that really what they had removed in the first place was whatever part of the slurry they ended up reinjecting. And I think maybe to avoid some of that textual problem, I think maybe for the first time at the virtual podium today, my friend is basically falling back on an argument that depends not on what such HCTP means, but instead on the definition of HCTP in 1271.3. And I just want to address that argument in case this issue has gotten lost in the briefs, because looking at 1271.3d, I understood my friend to be saying that because there's that modifier which refers to being intended for implantation, transplantation, or infusion, that only by definition the final product is an HCTP, and that what was removed was never an HCTP in the first place. And I think that actually just misreads the text. If you look at the text, that modifier about being intended for implantation is just under the rule of the last antecedent, it's applicable to the last part of that line. In other words, the whole point is an article that contains cells or consists of cells or tissues where those cells or tissues are in turn intended for implantation is an HCTP. So the fat that's being removed is an HCTP, and what's being returned is something different. So we don't dispute that the SVF product being injected back into patients is an HCTP, but the requirement for the same surgical procedure exception under 1271.15 is that it has to be such HCTP. So the question is whether it is a different HCTP than the one that was initially removed. And just to point out, I think both the defendant's general position and the sort of definitional position that my friend was stressing at the podium this morning suffer from a kind of absurdity that the government has pointed out a number of times that I've never heard a response to. Which I ask Mr. Jett, let me interrupt you for a second on the last point that you made as to the word such in that modifier. If all that happened as to the extracted material or tissue was that it was cleaned or sterilized, would it be the same? Would it be such blank? Yes, yes. FDA's position is that would be such, and I think again the skin graft example is a good when you remove a skin graft, you may very well clean something off of it. You may very well trim it. I should maybe put a footnote on it and say I don't know what would be involved in your honor's sterilization example. So it's always possible that the process of sterilizing would in turn, you know, kind of fundamentally alter whatever was removed. But assuming that it really was just some kind of basic cleaning and trimming, it would remain. In my example, it's just meant to eliminate any possible impurities that the doctors or the entity don't want going back into the body. Yes, yes. I think that would remain such HCT being, you know, obviously I'm always reticent to make any blanket statements on behalf of FDA, particularly, you know, because of the scientific complexity here. And there might be some, you know, kind of hard anomalous example, but ordinarily I think that would remain such HCTP. And I think even if, even if you then sort of step back beyond just the terminology such HCTP, just consider the context, structure, history, and purpose of this regulation. I mean, this section 1271.15 is a section of complete exemption where there is no applicability for the FDCA, nor even of just the basic kind of cleanliness and sterility requirements that come into play under the PHSA. And if you just look at the other exemptions in 1271.15, these are things like science research, couriers, storage. And I think when you just consider the nature of those and the nature of these exemptions, it becomes clear that plaintiffs, excuse me, defendants seemingly limitless position about kind of how to apply to such HCTP term just can't be right. And that's especially true then when you zoom out further and realize that this regulatory structure is essentially a three tiered structure where there are a category of items which are subject to less regulation because of reduced risk in contrast to what we have here where it's subject to absolutely no regulation. And then just consider the history of this. I mean, FDA stressed that in its initial proposed approach, as they promulgated these regulations all the way up to the draft guidance document and the final document. The whole point of this is just to capture things where it's pretty clear that the safety concerns, the effectiveness concerns are just those of ordinary surgery. And I think my friend just now at the virtual podium was suggesting that the government hasn't put on kind of sufficient evidence to prove that the sort of adverse events that the FDA found and that were discussed in the brief were necessarily caused by their product. But the question here is an interpretation of a regulation. The question is not to prove that every aspect of an underlying policy applies in a particular case. And critically, the policy is not that things definitely are dangerous or definitely are going to be contaminated. It's simply that they contain the sorts of risks that means that they should be subject to some kind of regulation. And to be clear, the FDA's position is not that this product definitively could never be used or could never be marketed. It's simply that this product is subject to applicable regulation. And so, for example, it can't be adulterated. It can't be misbranded. Ordinarily, they would need to get FDA approval. And in fact, there are products like the ones that the defendants are selling here that are the subject of pending investigative new drug applications by other doctors and by other companies. And what the defendants are essentially trying to do is just to circumvent that entire process and the entire regulatory structure by claiming that this is like a skin graft that is removed and then returned, when in fact what they are doing is removing fat and what they are doing is returning something quite different. Are you saying that an NDA should be required? I believe that's correct. I mean, the particular claim in this suit by the FDA was brought because the product is adulterated and misbranded. So, you know, it's not being properly manufactured. It doesn't contain proper labeling. Ordinarily, in order to be able to get that proper labeling, they would need to have FDA approval. Obviously, that's not specifically at issue in this case. There are various subparts of that regulatory structure. But again, I think what the defendants are doing is just trying to evade this entire process. Jed, I have a different question for you. And my question goes to this second tier of regulation, this mid-tier under Section 361 of the PHSA and the Regulation 1271.10. Do you follow where I want you to focus? I do. Yes, Your Honor. My question is basically this. One of the essential questions there is whether the defendant's SVP meets the homologous use criteria of Section 1271.10. And my question there is whether or not there isn't really a material issue of fact in dispute. The district court held, as I understand it, that the defendants did not qualify for minimal regulation solely because Section 361 of the PHSA because it found that the defendant's SVP was not intended for homologous use. That much we agree on, right? Yes, Your Honor. Okay. The district court explained in reaching that determination that, quote, providing a regenerative function in the donor is not the same function as restoring self-function, contributing to anti-inflammatory process, and otherwise treating this litany of illness in the recipient. Wasn't that an impermissible finding of fact at the summary judgment stage? Didn't the district court conclude that SVP does not restore self-function, it doesn't contribute to anti-inflammatory process, et cetera, et cetera, when there was, in fact, in this record, an expert report offered by the defendants detailing the exceedingly important regenerative function of SVP? There was, for example, an expert who said, proffered by the defendant, and I quote, there is abundant literature dedicated to these populations. For example, adipose contains cells capable of repairing and regenerating damaged tissues such as irradiated skin, alleviating fibrotic changes, improving mobility and vitality, repairing structures such as hair follicles and lymphatics. The adipose stem cell also serves as progenitors of cells which contribute to the vascular network formulation, formation, and vascular structure. All I'm asking in a wordy way is whether or not there weren't material issues of fact in dispute in this record concerning the determination whether the SVP meets homologous use. And if that is right, would the district court not have clearly erred in taking that matter on herself and reaching her own factual determination? Your Honor, the district court did not err in that sense. That is for a legal reason that I will explain in just a moment. But I actually think the argument that Your Honor has just kind of drawn out as some detail is also not properly before the court. So if I could just kind of start by explaining that, and I'll circle back to explain why this was more a legal conclusion than a factual conclusion. If you look at the district court's decision, I believe it's footnote 10 of that decision contains both some legal analysis that the defendants have never challenged about how to understand and compare intended use, and then also contains legal analysis about what to view as the kind of donated function. And so just as an initial matter, what the district court said in that footnote, is that you should understand this by looking at the function of counsel two minutes, please. Thank you that you should look at that tissue rather than the function of stromal vascular faction. The district court explains that the defendants had just failed to respond to that argument at all. And so in that sense, when the defendants that here in their blue braids say just start talking about stromal vascular faction, I think that argument is actually doubly waived both in district court, the district court said that they had not properly responded to that in footnotes. And, and then again, here, they don't explain why it is that you should be looking at the purpose of stromal vascular faction. Instead, they just jump right into it without challenging what was the district court's initial conclusion in that footnote. But second, Judge Marcus, I think that you say they waived it in the district court, because they never made that argument. Is that the essence of your, your position? I think that's right. It was the district court said they waived in the district court, they just say what the district court said. I want you to tell me what I will find in this record, that suggests they waive this argument. So before the trial court, you will certainly see them make the same kind of assertions and claims that they make here, where they just say you should look at the purpose of stromal vascular faction. What I don't think you will find is they're engaging with the government's reasons for why you should be looking at fat rather than stromal vascular faction. So essentially, this started in the government's motion for summary judgment where the government said this that this 1271 10 category doesn't apply. The government then, among other things, explained in its briefing why it thought fat was the appropriate referent. And as the district court says in footnote 10, the defendants kind of made some conclusory assertions about why the government shouldn't be able to rely on guidance documents, but did not actually engage with the government's reason for why fat rather than stromal vascular factor about your reasoning that they fail to engage with? Well, I mean, I think at bottom, the problem is stromal vascular faction isn't something that really exists in a human body. I mean, it's just a term for a kind of collection of different cells that exist in fat that are then kind of put together. So it's very difficult to say that stromal vascular faction serves any particular function, since really, it is this sort of collection of different things in different places in fat. I think that then is the government's understanding of why fat is the appropriate referent product. And that's not an argument that I understand the defendants to have engaged with or for that matter, reply brief here. But Judge Marcus, just just to sort of step back for a moment, an argument they never made. I'm sorry, Your Honor. So I offered an argument that they never raised. I think you offered a factual point that they did raise. But the factual point was premised on the idea that the referent is stromal vascular faction rather than fat. And the district court in that footnote said that is an initial matter, the referent is fat, and said that the defendant cannot explain and not adequately responded to the government's argument about why fat is the appropriate referent. And so in that sense, just as a legal matter, if as the district court said in district, the district court said in that footnote, fat is the appropriate thing to be looking at, then the primary function of fat is cushioning and support, certainly not something that stromal vascular faction does. But Judge Marcus, I do just want to make sure I address your question head on, which is, and I think there are two legal responses to it. The first legal response, and you will again also find this in footnotes 10 of the district court decision, is that when you're evaluating the function of cells, you don't look at whether there's any function that overlaps, you look at whether all functions overlap. And so stromal vascular faction, even to the extent that you could sort of try to figure out what its function is, when it's, you know, kind of dispersed throughout fat, a big chunk of what it's doing is what fat is doing, cushioning and support, which is not something that it's doing when it's being used to cure something like Parkinson's disease. But finally, Judge Marcus, the other legal answer to your question is the one that I understand the district court to be spelling out in its opinion, which is, you can't simply say that a cell regenerates and repairs, almost every cell regenerates and repairs. Take it at that level of generality, the homologous use criteria would mean nothing. You need to ask what and how is it regenerating? What and how is it repairing? And I think what the district court made clear in the body text of its decision is that there's no dispute that the kind of regeneration that goes on, if it's curing Parkinson's disease or curing macular degeneration is the kind of regeneration that goes on, even as a sort of small part of its job when it's dispersed in fat tissue. So the expert didn't do enough when he said, by way of example, adipose contains stem cells capable of, and then he is more particular than stating it just at the highest order of abstractions. He says repairing and regenerating damaged tissues such as irradiated skin, alleviating fibrotic changes, improving mobility and vitality and repairing structures such as hair follicles and lymphatics. Is it your view that that's still too abstract? No, I think I would have a separate response to that. I mean, that may be too abstract, but just factually, whether the cells are capable of repairing and regenerating is different from whether they are actually doing it. In other words, homologous use asks, what are they doing in the donor, in the fat? And then what are they intended to do when they're being donated? And so I think when the expert- So what is the germ capable of repairing and regenerating, the framing by the expert, is that what this all turns on? If he had said, for example, adipose contains stem cells and regenerate damaged tissues such as irradiated skin, blah, blah, blah, blah, and blah, blah, would that have been enough to create a trivalent effect? It's a little hard to wrap my head around the hypo. I think there are two different moving parts here, and maybe this is why this is getting a little bit confusing. One is the expert would have needed to say that these cells are in fact doing that where they are in the donor, immersed in the fat. And I certainly don't understand him to say, for example, that cells that are located in fat are regenerating nerve tissue because there isn't that kind of nerve tissue in fat. All that he's saying is that they're capable of doing it. In other words, really all that he's doing is he's describing the scientific possibility of what they would do in the recipient, but for homologous use- Well, I remember the last sentence in that paragraph I read to you doesn't put it in the more abstract and possible formulation of well or capable. It says the adipose stem cells also serve, not that they are capable of serving, but also serves as progenitors of cells which contribute to vascular network formation and vascular structures. I confess that I'm not sure I understand what this means, but to the extent your objection is it's not enough to say it's possible, it could, you've got to say it does. The last sentence meets your objection head on. And as to that, there are two legal problems. The first is the legal conclusion that the district court drew in the footnote that the issue is just not whether there's any overlap in function, but rather that they need to be serving all of the same functions. Again, a legal conclusion that the district court drew in that footnote that the defendants have not addressed here. If the court were interested- It's not enough to say, to put it into dispute as a material fact, it serves as. So I read that sentence as saying that that is some of what the stem cells do, not that that is all of what the stem cells do. But even if I'm mistaken then, there's an additional legal response. And that's the kind of high level generality of argument that we were talking about just a moment ago, which is it's not sufficient for the purposes of homologous use just to say that the donated tissue and where it's donated to will be engaging in something like regeneration. Because at that level of generality, essentially every cell foots the bill. And that's not really what homologous use is about. Thank you very much. Thank you, Judge Martin. All right, Mr. Jett, thank you very much. We've taken you over your time. And we'll go back to Ms. Chamberlain for her rebuttal argument. Thank you. I believe that counsel's argument shows why there are issues of fact as to the application of section 1271.10 to this situation. The waiver argument is a very clever one in that what the government is arguing is that we waived the opportunity to prove that adipose tissue serves the same function as SVF cells. Well, that was not our argument. And that premise is, we believe, fallacious. The reason the court didn't get to the factually issue of the undisputedly disputed factual issue as to homologous use and minimal manipulation was that the court bought the FDA's argument based on its 2017 guidance that the 1271.10 imported into it the such HCTPs language, even though that phrase does not appear in 1271.10. 1271.10 doesn't have a comparison between the removed and the implanted. And yet the government convinced the lower court that because the cells were derived from fat, they ipso facto could not have homologous use as they had in whatever they were removed from. And ipso facto, they were minimally manipulated, even though there was no showing argument proof whatsoever as to any manipulation of the cells themselves, or any different use of the cells themselves in the implantation procedure. But going back to the SP surgical procedure itself, the such HCTPs language was glossed by the government and the court below based on the phrase in their original form, which appears nowhere in regulation, nowhere in the SSP exception, but only in that, that guidance, which I think we have to now dispense with, because the government has decided that their regulation is unambiguous. And if we're looking at an unambiguous regulation, we're looking at the SSP exception, which does not have any more than minimally manipulated limitation or requirement, does not have any homologous use requirement, does not have any in their original form requirement. And the language that was used regarding adulterated and misbranded, well, you could say that about anything that falls within the SSP exception, if you suddenly say that the SSP exception does not apply to this. This is not a situation in which we are contesting that the FDA could not regulate the SVF surgical procedure. However, it has not. It provided an exception that allowed this therapy to be developed and used for seven years. And then that was all fine until they suddenly say, well, no, now we're going to say that there are these minimal manipulation and in their original form requirements on the, in 1271.15, which nowhere appear in that, and just sort of pretend that it was there all along, when nothing about the legislative history of that, the materials regarding adoption of that has been no showing of any change in research or science that justifies this change. If they want to do it, perhaps they could justify it after research, after the comment and the rulemaking procedure is gone through. We're not arguing today. Ms. Chamberlain, you're a minute over your rebuttal time, so thank you both very much. Thank you very much.